ALAMEDA BOOKS, INC., a California corporation; Highland Books, Inc., a California corporation, Plaintiffs–Appellees,

v.

CITY OF LOS ANGELES, Defendant–Appellant.

No. 98–56200.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Feb. 8, 2000

Filed July 27, 2000

As Amended on Denial of Rehearing Aug. 28, 2000

**720**

Michael L. Klekner, The City of Los Angeles, Los Angeles, California, for the defendant-appellant.

G. Randall Garrou, Weston, Garrou & DeWitt, Los Angeles, California, for the plaintiffs-appellees.

Robert W. Hargreaves, Best Best & Krieger, Rancho Mirage, California, for amicus curiae Sixty–Five (65) California Cities, in support of the appellant.

G. Randall Garrou, Weston, Garrou & DeWitt, Los Angeles, California, for amicus curiae Center for Fair Public Policy in support of the appellees.

Richard J. Hertzberg, Phoenix, Arizona, for amicus curiae L.J. Concepts, Inc., in support of the appellees.

Before: BOOCHEVER, HAWKINS, and THOMAS, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

We must determine whether the district court was correct in concluding as a matter of law that ordinances of the City of Los Angeles (the "City" or "Los Angeles") prohibiting the operation of adult businesses that both sell adult products and contain facilities for the viewing of adult movies or videos were inadequately supported by evidence of adverse impact so as to violate the First Amendment. We affirm.

## I.

### BACKGROUND

On July 28, 1978, the City enacted Ordinance No. 151,294, adding section 12.70 to the Los Angeles Municipal Code ("L.A.M.C."), which prohibits the "establishment, substantial enlargement or transfer of ownership or control" of an adult business establishment "within 1,000 feet of another such business or within 500 feet of any religious institution, school or public park within the City of Los Angeles." L.A.M.C. § 12.70(C) (1977). The regulation was enacted after a comprehensive study, conducted in 1977 and assessing the impact of concentrations of adult businesses on surrounding areas, found a positive correlation between concentrations of adult businesses and increases in prostitution, robberies, assaults, and thefts.[1]

In 1983, the City amended section 12.70(C), with the passage of Ordinance No. 157,538 to prohibit so-called "multiple use" adult businesses. Section 12.70(C), as amended, additionally prohibits "the establishment or maintenance of more than one adult entertainment establishment in the

---

1. The Study also stated there was "some basis to conclude" that property values in the study areas increased to a lesser degree than in the control areas. It concluded, however, that the concentration of adult businesses was not the primary cause of this phenomenon.

same building, structure, or portion thereof...." L.A.M.C. § 12.70(C). The 1983 amendments also modified the existing definition of an "adult entertainment business" to specifically categorize *inter alia* an "adult bookstore" and an "adult arcade" as "separate adult entertainment businesses even if operated in conjunction with another adult entertainment business at the same establishment." L.A.M.C. § 12.70(B)(17).

Appellees, Alameda Books, Inc. ("Alameda") and Highland Books, Inc. ("Highland"), are two adult businesses operating within the city limits of Los Angeles. Neither is located within 1,000 feet of another adult business nor within 500 feet of any religious institution, public park, or school. Each business occupies less than 3,000 square feet. Both Alameda and Highland rent and sell sexually oriented products, including videotapes. Additionally, both businesses provide booths where patrons can view videotapes for a fee. The booths are of two types. In the Preview Booths customers can view videotapes that are for rent or sale within the store. The Multi-channel Viewing Booths allow customers to choose from dozens of pre-selected videotape selections.

The video booths and the retail sales and rental of tapes of both stores are located in the same commercial space within a single building. There are no distinctions, physical or otherwise, between the different operations within each of the stores. Each has only one entrance door, and one employee supervises the entire location. Additionally, the appellees are the sole owners of each of their stores, and revenue from the video booths and the sales and rentals is not distinguished in any way, other than for internal accounting purposes. Notwithstanding these facts, it is uncontested that both businesses have operations that fall within the definitions of "adult bookstore" and "adult arcade" under section 12.70(B)(17) of the L.A.M.C.

On March 15, 1995, a City building inspector found that Alameda was operating both an adult bookstore and an adult arcade in the same building and was therefore in violation of section 12.70(C). Alameda and Highland then joined as plaintiffs and sued for declaratory and injunctive relief under 42 U.S.C. § 1983 to prevent enforcement of the ordinance. Both the City and the appellees filed cross-motions for summary judgment.

The district court initially denied both motions on the First Amendment issues, concluding that there was a "genuine issue of fact as to whether plaintiffs' bookstore and arcade components were separate businesses, like those whose concentration was examined by the 1977 studies." Alameda and Highland then filed a motion for reconsideration of the First Amendment portion of the district court's order denying summary judgment. On June 2, 1998, the court vacated its prior order and granted summary judgment for Alameda and Highland and issued a permanent injunction enjoining the enforcement of the ordinance against the appellees. The City then appealed to this court. We have jurisdiction under 28 U.S.C. § 1291.

## II.

### STANDARD OF REVIEW

A grant of summary judgment is reviewed *de novo*. *See, e.g., Robi v. Reed*, 173 F.3d 736, 739 (9th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 375, 145 L.Ed.2d 293 (1999). We must determine, viewing the evidence in the light most favorable to the appellants, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. *See, e.g., Berry v. Valence Tech., Inc.*, 175 F.3d 699, 703 (9th Cir.), *cert. denied*, —— U.S. ——, 120 S.Ct. 528, 145 L.Ed.2d 409 (1999). We do not weigh the evidence or determine the truth of the matter; rather, we only decide whether there is a genuine issue of materi-

al fact for trial. *See Colacurcio v. City of Kent,* 163 F.3d 545, 549 (9th Cir.1998).

■ The constitutionality of a regulation is a question of law that is reviewed *de novo. See Gonzalez v. Metropolitan Transp. Auth.,* 174 F.3d 1016, 1018 (9th Cir.1999).

## III.

## ANALYSIS

A. *Renton* Analysis

Our inquiry, though not the result, is somewhat complicated by two varying formulations of the test governing our analysis. In *Tollis v. San Bernardino County,* 827 F.2d 1329 (9th Cir.1987), we were presented with the opportunity to apply the then-recent decision of the Supreme Court in *City of Renton v. Playtime Theatres, Inc.,* 475 U.S. 41, 106 S.Ct. 925, 89 L.Ed.2d 29 (1986), which analyzed the constitutionality of city zoning regulations that prohibited adult theaters from being located within 1,000 feet of any residential zone, single– or multiple-family dwelling, church, park, or school. *Tollis* held that *Renton* had established a "three-step inquiry" to determine the constitutionality of such ordinances. *Tollis,* 827 F.2d at 1332. A reviewing court must inquire: (1) whether the ordinance is a time, place, manner regulation; (2) if so, whether it is content-neutral or content-based; and (3) if content-neutral, whether it is "designed to

serve a substantial governmental interest and do[es] not unreasonably limit alternative avenues of communication." *Id.* (internal quotations omitted); *see also Renton,* 475 U.S. at 47, 106 S.Ct. 925.

More recently, we formulated this test in a slightly different and (we believe) more coherent manner. In *Colacurcio v. City of Kent,* 163 F.3d 545 (9th Cir.1998), we looked to the Supreme Court's opinion in *Ward v. Rock Against Racism,* 491 U.S. 781, 109 S.Ct. 2746, 105 L.Ed.2d 661 (1989), to determine the constitutionality of the city's ordinance requiring nude dancers to perform at least ten feet from patrons.[2] Citing to *Ward,* we held that "[m]unicipalities may impose reasonable restrictions on the time, place or manner of protected speech, provided the restrictions are: (1) content-neutral; (2) narrowly tailored to serve a significant government interest; and (3) leave open ample alternative channels for communication of the information." *Colacurcio,* 163 F.3d at 551.

The differences between the *Tollis* and *Colacurcio* test are slight, yet obvious. *Colacurcio* eliminates *Tollis*'s first step—determining whether the ordinance is a time, place or manner regulation—and merely splits the two inquiries of *Tollis*'s third step—narrow tailoring to serve a significant government interest and ample alternative means of communication—into two separate steps.[3] Clearly, there is no

---

**2.** *Colacurcio* involved expressive conduct, which is not at issue here. The Supreme Court, however, has noted that the test for regulations affecting expressive conduct is nearly identical to the test for time, place, or manner regulations affecting protected speech. *See Clark v. Community for Creative Non–Violence,* 468 U.S. 288, 298, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) ("[V]alidating a regulation of expressive conduct ... in the last analysis is little, if any, different from the standard applied to time, place or manner restrictions."). Consequently, in *Colacurcio* we looked to *Ward,* a case involving restrictions impacting on speech per se (and not expressive conduct), for guidance. *See also Colacurcio,* 163 F.3d at 551, n. 4 (quoting *Clark* and noting that the Ninth Circuit fre-

quently cites both the test for expressive conduct and that for time, place or manner regulations when analyzing regulations of adult entertainment).

**3.** We note that in *Colacurcio* we held that the regulation must serve a "significant" government interest, *see* 163 F.3d at 551, while in *Tollis* we held that the government interest must be "substantial." 827 F.2d at 1332. We accord no substantive difference to these terms as they are used in the adult zoning context. Indeed, the language in *Tollis* was taken from our decision in *Walnut Properties, Inc. v. City of Whittier,* 808 F.2d 1331, 1334–35 (9th Cir.1986), which was cited with approval in *Colacurcio. See* 163 F.3d at 551 n.

substantive difference between *Tollis* and *Colacurcio*, and a given result under one necessarily dictates an identical outcome under the other. Moreover, the jurisprudence governing each test is fully applicable to both.

*Colacurcio*, however, better formulates the test. First, the third step of *Tollis* incorporates two distinct inquiries, which are more properly separated for both conceptual and practical reasons in *Colacurcio*. Additionally, *Tollis* needlessly establishes the time, place or manner inquiry as a distinct step. Time, place or manner is an objective description of a regulation (or one proffered by the enacting legislative body); it is not a talismanic incantation affording the ordinance a lesser degree of judicial scrutiny. To the contrary, the question the courts must ask is whether the time, place or manner regulation is content-neutral. The Supreme Court recognized as much in *Ward* when it excluded a time, place or manner analysis, which it had included in *Renton*, from its discussion. For the sake of clarity and consistency in future opinions, and because we believe the *Colacurcio* formulation is more aptly constructed, we will utilize it here.

As a preliminary matter, we note that section 12.70(C) comes under the general category of a time, place, or manner regulation. *Renton* held that zoning regulations governing adult businesses are generally considered time, place or manner regulations. *See Renton*, 475 U.S. at 46, 106 S.Ct. 925. Moreover, section 12.70(C) does not ban adult entertainment establishments altogether. *See Tollis*, 827 F.2d at 1332 (holding that ordinance before the court was "obviously" a time, place, or manner regulation "as it [did] not ban adult theaters altogether").

■ Under *Colacurcio*'s first step (i.e. *Tollis*'s second step), a regulation is content-neutral if the ordinance is "aimed to control secondary effects resulting from the protected expression rather than at inhibiting the protected expression itself." *Tollis*, 827 F.2d at 1332 (internal quotation omitted) (citing *Renton*, 475 U.S. at 48–49, 106 S.Ct. 925); *see also Renton*, 475 U.S. at 48, 106 S.Ct. 925 (regulation is content-neutral if it is "justified without reference to the content of the regulated speech").[4] We need not decide whether the contested regulation is content-neutral, for even if it were, it fails to satisfy the second step in the *Colacurcio* analysis (i.e. the third step of *Tollis* ).[5]

B. *Colacurcio*'s Second Step: Substantial Government Interest

■ The City has a "substantial government interest" in reducing crime in its neighborhoods. *See Young v. American Mini Theatres*, 427 U.S. 50, 71, 96 S.Ct. 2440, 49 L.Ed.2d 310 (1976) ("[T]he city's interest in attempting to preserve the quality of urban life in one that must be accorded high respect."). At issue is

---

4. Additionally, *Tollis* did not explicitly include the narrow tailoring requirement as part of its third step. That *Tollis* requires the regulation must be "narrowly tailored" to serve a substantial government interest is, however, clear from the opinion. *See Tollis*, 827 F.2d at 1333 (holding that "[t]he County has thus failed to show that the ordinance, as interpreted by the County ... is sufficiently 'narrowly tailored' to affect only that category of theatres shown to produce the unwanted secondary effects") (*quoting Renton*, 475 U.S. at 51, 106 S.Ct. 925).

4. As discussed above, because the *Tollis* and *Colacurcio* tests are identical, the standards applied to one may be applied to another.

5. The district court conducted its analysis using a slightly different approach that, though perfectly reasonable, somewhat conflated the inquiries under *Tollis*'s second and third steps. We need not specifically endorse this analysis, as section 12.70(C) fails to satisfy the second step of *Colacurcio* (i.e. the third step of *Tollis*.) *See Cline v. The Indus. Maintenance Eng'g and Contract Co.*, 200 F.3d 1223, 1229 (9th Cir.2000) ("Summary judgment may be affirmed on any ground supported in the record, including reasons not relied upon by the district court.").

whether the regulations are "designed to serve" this interest. We hold they are not.

The only evidence relied upon by Los Angeles to justify the 1983 amendments to section 12.70(C) is the 1977 study (the "Study"), which was used as the basis for the enactment of the original regulations. This is insufficient.

The Study looked at the concentration of four types of adult businesses: massage parlors, "bookstores/arcades," theaters, and adult motels. It assessed five areas where these businesses were concentrated and compared crime rates in these areas with rates in nearby "control" areas. Additionally, the Study measured changes in assessed land values from 1970 to 1976 in the study and control areas. As noted, the Study concluded that there was a positive correlation between concentrations of these adult businesses and increases in prostitution, robberies, assaults, and thefts.

■ The district court found that the Study addressed the secondary impact not of single adult business establishments, but of concentrations of separate, individual adult businesses, and that appellees' businesses are not separate in the sense that the businesses surveyed in the Study were separate establishments. As the Study was the only evidence to justify the 1983 amendments, the district court held that summary judgment was appropriate because the City could not meet its burden to show that it "relied on evidence supporting a reasonable belief that combination businesses ... produced harmful secondary effects of the type asserted" in the 1977 Study. We agree.[6]

The Study treated a bookstore/arcade combination as a single business or unit of adult entertainment whose secondary effects arise from its proximity to several other units of adult entertainment. It did not analyze an individual bookstore/arcade combination as a concentration of adult businesses.

Additionally, the Study was not directed at determining the impact of individual adult entertainment business units. Rather, its purpose was to ascertain the impact of a concentration of such business units in small geographic areas. Therefore, by categorizing certain businesses as "bookstore/arcades," the Study determined not what the impact of a "bookstore/arcade" was on the surrounding area, but the impact of a bookstore/arcade as an individual business entity that was part of a concentration consisting of multiple adult business establishments. As such, the Study did not identify any harmful secondary effects resulting from bookstore/arcade combinations as individual business units.

The City does not argue that the Study explicitly considered adult arcades and bookstores as separate business entities, an argument that would support its contention that a combination bookstore/arcade as an individual business entity is a "concentration" of adult businesses. Nor does it dispute that the concentration of adult businesses was the primary cause of the harmful secondary effects identified in the Study. Indeed, the pertinent findings of the Study focus solely on the concentration of separate adult business entities. Rather, the City asserts that the Study provides enough of a basis to allow it to constitutionally proscribe combination

6. It is well-established that the burden of proof is on the City to, justify a regulation which burdens the freedom of expression. *See, e.g., Clark v. Community for Creative Non–Violence*, 468 U.S. 288, 293 n. 5, 104 S.Ct. 3065, 82 L.Ed.2d 221 (1984) ("[I]t is common to place the burden upon the Government to justify impingements on First Amendment interests"); *Lim v. City of Long Beach*, 217 F.3d 1050, 1054 (9th Cir.2000) (noting that it is

"clear" that the burden of proving alternative avenues of communication rests on the government); *Tollis*, 827 F.2d at 1333 ("The County *must show* that in the enacting particular limitations ... it relied upon evidence permitting the reasonable inference that, absent such limitations, the adult theaters would have harmful secondary effects." (emphasis added)).

adult businesses under section 12.70(C) of L.A.M.C. The City's arguments fail.

In examining the City's regulation of adult businesses, we are mindful of numerous admonitions from the Supreme Court about the proper role of the judiciary in scrutinizing legislative judgments. In *American Mini Theatres*, the Supreme Court recognized that the courts are not to second-guess legislative solutions. In upholding the validity of a zoning regulation prohibiting adult entertainment establishments within 1,000 feet of one another, the Court stated: "It is not our function to appraise the wisdom of [the City Council's] decision. . . . Moreover, the city must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems." 427 U.S. at 71, 96 S.Ct. 2440; *see also Renton*, 475 U.S. at 52, 106 S.Ct. 925 (quoting *American Mini Theatres*); *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 86 L.Ed.2d 536 (1985) (validity of a content-neutral time, place, or manner regulation does not "turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests"); *Jones Intercable, Inc. v. City of Chula Vista*, 80 F.3d 320, 326 (9th Cir.1996) (courts "accord substantial deference to the predictive judgments" of legislative bodies when analyzing content-neutral regulations that burden speech) (quoting *Turner Broad. Sys., Inc. v. FCC* ("*Turner I*"), 512 U.S. 622, 665, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994)).

This deference to legislative decision making is not unbounded. In *Tollis*, we established a predicate evidentiary requirement that must be met before we will defer to the judgments of legislative bodies enacting content-neutral time, place, or manner regulations that incidentally burden speech. *Tollis* considered an injunction against the enforcement of a county zoning ordinance prohibiting adult-oriented businesses from locating within 1,000 feet of various other establishments (e.g., schools, churches, etc.). The county had

interpreted the ordinance such that a single showing of an adult movie would make a theater an "adult-oriented business" for the purposes of the ordinance. *See* 827 F.2d at 1331.

In affirming the injunction, we held that under *Renton*, the county "must show that in enacting the particular limitations . . . *it relied* upon evidence permitting a reasonable inference that, absent such limitations, the adult theaters would have harmful secondary effects." *Id.* at 1333 (emphasis added). We then found that the county had presented no evidence that a single showing of an adult film would have any of the harmful secondary effects on the community that the county had identified as the basis for the regulation. *Id.*

Like the county in *Tollis*, Los Angeles has presented no evidence that a combination adult bookstore/arcade produces any of the harmful secondary effects identified in the Study. As the above discussion indicates, the evidence the City has "relied" upon—the 1977 Study—contains no findings that an individual combination bookstore/arcade produces any of the increased crime the Study found resulting from a concentration of adult businesses. Therefore, it is unreasonable for the City to infer that absent its regulations, a bookstore/arcade combination would have harmful secondary effects. *See also Acorn Invs., Inc. v. City of Seattle*, 887 F.2d 219, 222 (9th Cir.1989) (holding unconstitutional under *Renton* a city licensing fee for specific types of adult theaters because the City had "failed to prove" that these theaters were responsible for fostering the alleged secondary effects—criminal activity—that were given as justification for the licensing fee); *Turner Broad. Sys., Inc. v. FCC (Turner II)*, 520 U.S. 180, 211, 117 S.Ct. 1174, 137 L.Ed.2d 369 (1997) (holding that in reviewing content-neutral regulations burdening speech under an intermediate scrutiny standard, the question for the courts "is whether the legislative conclusion was reasonable and supported by

*substantial evidence in the record before [the legislative body]"*) (emphasis added).

The City argues that the original intent of section 12.70(C), adopted pursuant to the Study, included a ban on more than one adult business in a building. This argument is unpersuasive. Whether the prohibition against combination businesses was intended to be included in the original ordinance is largely immaterial to the question of whether the Study adequately justifies the current regulations.

Nor could Los Angeles have reasonably concluded that the expansion of an adult bookstore to include an adult arcade would increase the frequency and regularity of activity for the business and heighten the probability that such activity would produce the harmful secondary effects identified in the Study. Such reasoning would justify the prohibition of the simple expansion of a lone adult bookstore in order to accommodate a larger variety of adult products (which, ostensibly, would attract more patrons), and not for the purpose of installing an arcade. Such a prohibition, however, is clearly not supported by the Study.

The Supreme Court, as well as this circuit, have held that a legislative body may rely on studies, conducted by other cities and counties, linking a concentration of adult businesses to increased crime to justify its own regulation of adult businesses. In *Renton*, the Court held that the city

> was entitled to rely on the experiences of ... other cities ... in enacting its adult theater zoning ordinance. The First Amendment does not require a city, before enacting such an ordinance, to conduct new studies or produce evi-

dence independent of that already generated by other cities, so long as whatever evidence the city relies upon is reasonably believed to be relevant to the problem that the city addresses.

475 U.S. at 51–52, 106 S.Ct. 925; *see also Colacurcio*, 163 F.3d at 551 ("In evaluating the secondary effects of adult entertainment, the city is also permitted to rely on experiences of other jurisdictions.").

Los Angeles relies on this ability to use foreign studies for the proposition that the 1983 amendments to section 12.70(C) are entitled to similar deference. If foreign studies can be used to justify the regulation of adult business, then surely, the City argues, its regulations, based upon its own study, are entitled to deference. Again, this argument misses the mark. That a legislative body may rely on foreign studies to establish its interest in a regulation does not relieve that entity from the obligation of demonstrating that the study must be "'reasonably believed to be relevant to the problem that the city addresses.'" *Colacurcio*, 163 F.3d at 551 (quoting *Renton*, 475 U.S. at 51–52, 106 S.Ct. 925). As shown, the Study fails this test.[7]

The City also points to decisions of our sister circuits in support of its argument that the Study provides the necessary evidentiary basis to satisfy *Renton*'s third prong. The cases cited, however, are either directly contrary to established Ninth Circuit precedent, or merely restate the requirement that a legislative body's reliance upon the evidence it cites must be reasonable. *See, e.g., Renton*, 475 U.S. at 51–52, 106 S.Ct. 925.

---

**7.** In this regard, the Supreme Court's recent opinion in *City of Erie v. Pap's A.M.*, 529 U.S. 277, 120 S.Ct. 1382, 146 L.Ed.2d 265 (2000), is of little aid to Los Angeles. In upholding the City of Erie's ban on nude dancing, the Court stated that "Erie could reasonably rely on the evidentiary foundation set forth in *Renton* and *American Mini Theatres*" with respect to the secondary effects of adult entertainment establishments because the nude dancing that claimed protection was "of the same character as the adult entertainment at issue" in the two cases. *Id.* at 1395. For the purposes of the secondary effects identified in the Los Angeles Study, a solitary bookstore/arcade combination is hardly of the "same character" as a grouping of multiple adult business establishments in a given geographical area.

In *ILQ Investments, Inc. v. City of Rochester*, 25 F.3d 1413 (8th Cir.1994), the Eighth Circuit upheld the constitutionality of an adult business zoning ordinance, as applied to adult bookstores, that prohibited on-premises viewing of adult movies or videotapes. The court noted that Rochester relied on foreign studies and held that under *Renton*,

> Rochester need not prove that [plaintiffs' business] would likely have the exact same adverse effects on its surroundings as the adult businesses studied by [other cities]. So long as Ordinance No. 2590 affects only categories of businesses reasonably believed to produce at least some of the unwanted secondary effects, Rochester must be allowed a reasonable opportunity to experiment with solutions to admittedly serious problems.

*Id.* at 1418 (internal quotation omitted). While this application of *Renton* may be somewhat more flexible than the standard we announced in *Tollis*, Los Angeles's regulations would still fail under the Eighth Circuit's analysis. The Los Angeles Study examined concentrations of multiple adult business establishments; it did not study the impact of individual establishments in any form, whether as solitary units or as part of the concentration of businesses. Under the Eighth Circuit's analysis, then, Los Angeles could not have reasonably believed, based on the Study, that an individual adult business could produce some of the secondary effects resulting from a concentration of businesses.

In *Mitchell v. Commission on Adult Entertainment Establishments*, 10 F.3d 123 (3rd Cir.1993), the Third Circuit upheld a Delaware statute setting closing hours for adult businesses and prohibiting closed viewing booths. The court cited to *Renton* and held that the state "need only show that adult entertainment establishments as a class cause the unwanted secondary effects the statute regulates." *Id.* at 138. This statement and the Third Circuit's citation to *Renton* pertain to whether the regulation is narrowly tailored, not whether the evidence produced can reasonably justify the regulation as serving a substantial government interest. Narrow tailoring of the Los Angeles ordinance is a question we need not address.

Moreover, if the Third Circuit's holding were applied to the issue before us, we would have to reject its analysis. Merely requiring that a legislative body show that adult establishments as a class cause the secondary effects the regulation is aimed at preventing could easily fall far short of our requirement in *Tollis* that a legislative body "must show that in enacting the particular limitations ... it *relied upon* evidence permitting the reasonable inference that, absent such limitations, the adult [businesses] would have harmful secondary effects." 827 F.2d at 1333 (emphasis added).

Finally, the City cites *Hart Book Stores, Inc. v. Edmisten*, 612 F.2d 821 (4th Cir. 1979), a case in which the Fourth Circuit examined a state law almost identical to the Los Angeles ordinance. *Hart* held constitutional a North Carolina statute prohibiting two or more "adult establishments" from occupying a single building. Adult bookstores and adult arcades were defined as separate establishments under the statute.

The Fourth Circuit found that the statute, "on its face," was a "permissible regulation of the external costs of adult establishments that is unrelated to the overall suppression of any protected materials offered by them for public consumption." *Id.* at 829. In concluding that the statute served a substantial government interest, the court noted that no formal legislative history existed for the statute, but held that a legislative determination that the dispersal of the marketing activities of the businesses might ameliorate adverse secondary effects "cannot be thought unreasonable." *Id.* at 828.

*Hart* was decided before *Renton;* therefore, there may be some doubt that it

would survive scrutiny under the current Supreme Court's precedent. We are sure, however, that the case would not pass muster under our decisions in *Tollis* and *Acorn*. In *Hart*, there was no evidence from foreign studies to support the statute. What evidence the court did cite as being produced by the state—a report on health conditions inside the video viewing booths that the bill's sponsor read to a legislative committee, *see id.* at 828 n. 9—would not meet *Tollis*'s reasonable inference requirement.

Prohibiting arcades and adult bookstores from being located in the same building would not prevent the type of unhealthy conditions in the booths that the Fourth Circuit cited as the only evidence produced by North Carolina to justify its statute. There is nothing in the case to indicate that the same type of behavior that occurs in viewing booths in combination bookstore/arcades would not occur in an establishment that only furnishes an arcade. Therefore, any inference that the statute could have an ameliorating impact on the identified harmful secondary effects would be unreasonable under both *Tollis* and *Acorn*.

The decision of the district court is AFFIRMED.